**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ANGELLE CLAIR,**

   Plaintiff,

vs.               No. CIV

**NEW MEXICO CORRECTIONS DEPARTMENT,**  **JURY TRIAL DEMANDED**
**C. MICHAELL MARTIN, KEITH D. MILLER and**
**WILLIAM HENDRIX, Individually,**

   Defendants.

**<u>COMPLAINT FOR VIOLATION OF CIVIL RIGHTS</u>**

Plaintiff Angelle Clair, by and through undersigned counsel, state:

**<u>Parties, Jurisdiction and Venue</u>**

1. Plaintiff Angelle Clair (hereafter "Clair" or "Plaintiff") is a female citizen of the United States and a resident of Roswell, Chaves County, New Mexico.

2. Defendant New Mexico Corrections Department (hereafter "the Corrections Department") formerly employed Ms. Clair at the Roswell Correctional Center.  Based on the number of employees and the duration of their employment, the Corrections Department is an employer subject to the statutory requirements of Title VII.

3. Upon information and belief, C. Michaell Martin ("Martin") is a resident of Clayton, Union  County, New Mexico.  He is sued in his individual capacity.

4.     Upon information and belief, William Hendrix ("Hendrix") is a resident of Roswell, Chaves County, New Mexico, presently residing at the Roswell Correctional Center.  He is sued in his individual capacity.

5.     Upon information and belief, Keith D. Miller ("Miller") is a resident of Santa Fe, New Mexico.  He is presently employed as the Emergency Preparedness Coordinator at New Mexico Corrections Department.  He is sued in his individual capacity.

6.     At all times material, Martin was the Warden at the Roswell Correctional Center ("RCC") and was acting under color of law and in the course and scope of his employment.

7.     At all times material, Hendrix was the Deputy Warden at the RCC and was acting under color of law and in the course and scope of his employment.

8.      At all times material, Miller was the Associate Warden at the RCC and was acting under color of law and in the course and scope of his employment.

9.     The events giving rise to this complaint occurred at the RCC in Chaves County, New Mexico.

10.    This Court has jurisdiction over the parties and the subject matter of this action.

11.    Venue is proper in this court.

12. Plaintiff has exhausted her administrative remedies as to her claims against Defendant Corrections Department under 42 U.S.C. Section 2000e, Title VII of the Civil Rights Act of 1991 (hereafter "Title VII"), having timely filed charges with the U.S. Equal Employment Opportunity Commission ("EEOC").

13. On January 15, 2010, counsel for Plaintiff received a Dismissal and Notice of Rights from the EEOC.  Plaintiff has timely filed this action within ninety (90) days of receipt thereof.

## General Allegations Common to All Counts

14. At material times, Plaintiff Clair was employed by the Corrections Department and worked at the Roswell Correctional Center ("RCC"), which is under the management and authority of the Corrections Department.

15. Clair began work at RCC February 3, 2003 as the Human Resources Administrator.

16. Clair held the position of Human Resources Administrator until her separation from employment in February, 2008.

17. At all times during the five years Clair worked for the Corrections Department, Clair's work performance was satisfactory or better.

18. Clair was supervised by Defendants Martin, Hendrix, and Miller (hereinafter collectively referred to as "the individual defendants").

19.     While employed by the Corrections Department at the RCC, Clair was
        subjected to a sexually hostile work environment.  The acts of sexual
        harassment were undertaken by the individual defendants, among others,
        and included but were not necessarily limited to inappropriate and
        suggestive remarks, sexual comments and innuendos.

20.     The acts of sexual harassment were frequent and regular.

21.     Beginning in 2004 and continuing well into 2007, Clair was subjected to
        repeated unwanted acts of sexual harassment.

22.     When Clair opposed the individual defendants' behavior, she became the
        subject of retaliation.

23.     In the summer of 2004, Clair began having problems at the workplace.

24.     The problems started with Warden Hendrix and Sergeant Mike
        Richardson, and included abusive language and remarks about her
        clothing.

25.      Warden Hendrix had contacted Captain Helms and reported that Clair
        was inappropriately dressed.  Captain Helms came to her office and told
        her that he had been instructed to look at the way she was dressed for
        work.  Captain Helms stated that she was in compliance.  Over the next
        several months, this happened every time Warden Martin was absent
        from the Facility.  Captain Helms would appear, make the comment "I'm
        back" and she would stand up and show him what she was wearing.

26.   On August 11, 2004, Clair filed an informal complaint against Sergeant Richardson, for telling her "to shut the f*** up" and for hostile behavior, and also expressed concerns about retaliation.  Sgt. Richardson's behavior continued, including sexual harassment, but the next time he called her on the phone, there were no witnesses.

27.   Elona Cruz, NMCD Bureau Chief,  became aware of sexual remarks made to Clair by Wardens Martin and Miller beginning around the time Miller was hired to work in RCC administration in November 2004.  Ms. Cruz warned Clair that Keith Miller was the Secretary of Corrections' brother-in-law.

28.   Ms. Cruz was present on a number of occasions when remarks were made about Clair and activities involving her, such as comments about the men putting a "mushroom stamp" on her forehead (sexual reference to penis).  Ms. Cruz would visit the facility or have conference calls during which both she and Clair were subjected to inappropriate comments and sexual gestures.  For example, the individual defendants would put a finger in their mouth, making a popping sound, or move their tongue on the side of their cheek and motion in a graphic manner with their hand.

29.   In early spring of 2005, Clair told Ms. Cruz about an incident that occurred when Warden Miller called Clair at home asking if she was busy and if she could talk. Miller asked Clair if her husband was home, and she told him no.  Miller told Clair that he slept with her business card on his night

stand, which was the closest way to be near her, thinking of her at night. It was shocking and Clair did not know what to say; it made her uncomfortable.   Clair told Warden Martin about the incident and he laughed.

30.   In February 2005, Clair reported a matter involving a Domestic Violence Restraining Order to Warden Martin.  Warden Miller was present when she informed the Warden.  Warden Miller began calling Clair "Marilyn Chambers."   Shortly after, she asked Miller why he called her Marilyn, and Warden Martin and Miller laughed.  Clair did not know who Marilyn Chambers was initially, but then Warden Miller told her Marilyn Chambers was a porn star.  Warden Miller continued to call her Marilyn until he left RCC.

31.   Human Resources Bureau Chief Elona Cruz later acknowledged that she knew that the Wardens called her Marilyn Chambers.

32.   In February 2005, Classification Supervisor Edwina Leal told her that the reason Deputy Warden Hendrix was so mean to her is because he was sexually frustrated towards her.   She said he acted that way "because he knows he can't have you."

33.   In the summer of 2005, Martin and Miller made inappropriate inquiries of Clair, such as whether she tanned naked and if she wore the same color bra and panties.  They also frequently asked Clair if she would she "get naked."  The inappropriate talk and gestures started to increase over the following months.

34.   In June 2005 at a staff meeting, Celestino Romero, NMCD Deputy Bureau Chief,  witnessed Clair vent to Human Resources Chief Cruz about the behavior of the Wardens and their inappropriate remarks.

35.   In approximately September of 2005, Clair was walking from Warden Martin's office back to her own when Martin called her back.  She returned and he stated that he wanted to see her walk away again.  Warden Martin stated that he still had a place under his desk waiting for her, then he thumped the underside of the desk drawer.

36.   In April of 2006,  Warden Hendrix questioned Clair about the pants that she was wearing, asking if she had any pants that went to her ankle. Hendrix also called Clair a bitch in front of Warden Martin.

37.   Over the next several months, Warden Martin mandated that Clair help Deputy Warden Hendrix with his wife's medical bills, which required that she contact the medical providers to clear up billing issues, which she did. During that time, she continued to have conflict with Warden Hendrix.

38.   After Lee Seyler was hired as RCC Emergency Preparedness Instructor, he called Clair and asked her out.   She told him no and informed him that she was married.  Seyler stated that he knew that, and it did not matter to him; he wanted to go out with her anyway.

39.   In April of 2006, Celestino Romero, NMCD Deputy Bureau Chief, and Clair discussed the ethics of the RCC Administration, and the history of acts of wrongdoing covered up.  Mr. Romero stated that he knew all about the way the wardens behaved.

40.     In May, 2006, Warden Martin informed Clair that she could no longer wear sleeveless blouses. He stated that he didn't personally care, but that he received a complaint that Clair's arms were offensive. She complied with his directive, although the dress code stated otherwise.

41.      In June, 2006, Wardens Martin and Miller were in Warden Martin's Office when Clair went in. While she was talking to them, Warden Martin acted like he was zipping up his pants and made thumping sounds under his desk. Martin told Clair that under his desk was her spot.

42.     In September 2006, Miller was suspended for pornographic material on his State computer. Clair had to prepare the suspension paperwork.

43.     Prior to the Staff Christmas Party in December of 2006, Clair was asked by the wardens if she was going and Martin, Miller and Hendrix talked about getting drunk and naked.

44.     In January, 2007, Clair asked if she could go to the Corrections conference in Ruidoso. She was told that the only way she would travel would be if she got naked and shared a room with Warden Martin.

45.     That same month, January of 2007, Warden Martin wanted to relocate Clair's office. Clair asked him if she could stay where she was. He stated to her "What are you willing to do for me?" She didn't respond and her office was moved.

46.     In February, 2007, Warden Martin called Clair into his office and told her that he went to a Discrimination/Sexual Harassment class and that he was "doing it right." He laughed and Clair told him that it wasn't funny.

47.     On February 5, 2007, Clair informed the Wardens that someone placed her business card in her mailbox and that they wrote "crack smoking Chihuahua" on it.

48.     On February 6, 2007, Warden Hendrix placed his hand in the middle of Clair's back and pushed her out of Warden Martin's Office.  Warden Martin witnessed the incident and did nothing about it.  Clair informed HR Bureau Chief Cruz, who then told her about a prior sexual harassment incident involving Warden Hendrix, and that he can never be trusted and to watch herself with him.

49.     Around March of 2007, Warden Miller asked Clair in front of Warden Martin if she wanted to mess around.  Warden Martin told Miller to give up, that Clair would never do that to her "perfect Patrick,"  referring to Clair's husband.

50.     In the early spring of  2007, HR Chief Cruz asked Clair why she never traveled to the conferences throughout the year.  Clair told her that Warden Martin would not let her go, because she refused his advances.

51.     In July of 2007, Clair recognized problems with a proposed Classification hire.   Warden Martin wanted Clair to falsify the "Justification for Selection" to put in his choice of a female candidate that did not meet criteria for the position.  Clair exchanged e-mail with Ms. Cruz about her serious concerns about the impropriety.

52.     On July 5, 2007,  Warden Martin refused to speak to Clair because of the Classification hire issue.  He blamed and belittled her in front of Hendrix and Seyler.

53.     On July 16, 2007, Clair observed Administrative Staff alienating her; no one spoke to her.   Clair reported to Ms. Cruz that Mr. Seyler yelled "incoming" when she approached the Warden's office.  Mr. Seyler dismissed her from the Warden's presence when the Warden stopped talking.  Clair also told Ms. Cruz that several staff, were wearing sleeveless tops, but that she had been told that she could not.   Ms. Cruz stated that Warden Martin cannot allow one and not another, and that policy stated that sleeveless can be worn.

54.     On July 18, 2007, Clair spoke with Ms. Cruz about for about 45 minutes, discussing ongoing problems with Wardens Martin, Miller, Hendrix and Mr. Seyler.  Ms. Cruz stated that she was aware of some of the issues, due to ongoing talk, language and gestures and past behaviors.  Clair and Cruz also discussed the continued harassment Clair was experiencing about her allegedly inappropriate dress, that a baby rattle had been left on her desk, and that she had her keys taken away from her.

55.     On July 23, 2007, Clair e-mailed a Leave Request to Warden Martin. Martin called her about the leave and said he would love to approve the time, because a day or hour without her was a great day.

56.     On July 26, 2007, Clair spoke again with Ms. Cruz about the continuing problems she had, including HR issues and other concerns, such as Mr.

Seyler still yelling "incoming" and Warden Miller belittling her and acting
condescending toward her.

57.    Shortly prior to Ms. Clair's written complaint in August 2007, Warden
       Martin asked Clair if she was wearing thong panties as they walked
       through the Admin Building.  He mentioned how he had been married for
       almost 20 years and that it wasn't good and that he wasn't "getting any."

58.    The above-referenced incidents are but examples of the types of behavior
       to which Clair was subjected at the workplace.  Clair can not identify all of
       the abusive language, gestures, sounds, looks and remarks that were
       made of a sexual or derogatory nature.  These actions occurred regularly,
       on a daily or weekly basis.

59.    On August 2, 2007, Clair spoke with Ms. Cruz about an inmate by the
       name of O'Gorman working at the direction of the wardens to build
       programs on the computer, having internet access, and being assigned
       the task of updating policy, as well as the continued problems she was
       having with the Wardens.

60.    On August 3, 2007, Clair sent Ms. Cruz e-mail advising her of the
       retaliation and persistent alienation she was experiencing,  prior to Clair's
       subsequent formal complaint to her.

61.    On August 4, 2007, Clair submitted a written complaint to Elona Cruz
       laying out numerous issues, to include sexual harassment, vulgar
       language and gestures, and other misconduct on the part of the individual
       defendants and others.  This complaint included charges of sexual

harassment and hostile work environment directed toward her and also opposed unlawful behavior and acts of discrimination toward others employed by RCC.  In addition, the complaint included reports of serious violations of Corrections Department policies and procedures, as well as abuses of authority by the Warden, Deputy Warden and Associate Warden.

62.   Clair did not submit a formal written complaint on the NMCD forms used for complaints of sexual harassment and for retaliation because she thought that the matter could be handled quietly.  Clair wanted the problems to be taken care of, and she thought that putting it in writing would take care of the situation.  She was assured by Ms. Cruz that this was the best way to go.

63.   After submitting her written complaint, Clair found herself the target of a number of complaints made against her and was the subject of constant scrutiny.

64.   On August 23, 2007, at approximately 8:00 am, Clair was walking to the Admin Building, when Warden Martin asked her why she was wearing shorts to work.  (Clair was not wearing shorts, but rather capri pants.)  In front of multiple staffers, Martin told Clair she needed to read the dress policy and to be prepared to be sent home.  At 9:45 am, he came to her office, stating that he was the governing authority and to never wear them again.  Clair e-mailed photos of what she was wearing to Ms. Cruz.  Approximately an hour later Warden Martin called her into his office and

told her that she could wear sleeveless, but he had no answer on the issues of her "shorts".

65.    During September, 2007, Clair began having problems with several corrections officers making comments to her.  Approximately seven complaints were filed against Clair, shortly after her complaint was filed on the Wardens.

66.    After Clair's written complaint in August 2007, she spoke with an investigator named Larry Flynn who had been assigned to the matter, Ms. Cruz and Captain Eddie Helms, several times a week about the retaliation.  Ms. Cruz made at least two trips to RCC.  Mr. Flynn made numerous trips through January 2008.

67.    The acts of sexual harassment ceased for the most part after her written complaint was filed, but Clair was the subject of ongoing retaliation that created an extremely hostile work environment.

68.    Clair reported the retaliation.  On September 13, 2007, Clair sent an e-mail to NMCD Investigator Larry Flynn about the continuing problems she was having.

69.    On September 21, 2007, Clair met with Mr. Flynn and Ms. Cruz in Roswell to answer questions about some of the responses received from Wardens Martin, Miller and Hendrix during the investigation of her complaint.  Clair learned that they had made allegations against her, to include that Clair was teaching sexual harassment classes unethically,  and that during training sessions, Clair offered to help staff file sexual harassments

complaints so that "they too could win money" like Clair.  During this meeting, Clair was asked if the sexual harassment was continuing, she stated no and that she thought and hoped that it would not again; however, retaliation was going on.  Clair stated that the Wardens were using other staff to retaliate against her.  Both of them agreed and stated that they were aware of what was going on at RCC.  Mr. Flynn stated that those in the Administration would not turn on each other.

70.     Clair communicated to Mr. Flynn and Ms. Cruz on more than one occasion that she was concerned for her employment and safety and that she was being targeted, but the Wardens and those acting at their direction never let up.

71.     On October 2, 2007, Clair sent a memo addressing continuing retaliation and the hostile work environment to Larry Flynn and Elona Cruz.

72.     On October 11, 2007, Clair's "take-home keys" were finally given back. They had been taken from her by Warden Martin in the summer.  Prior to that, Clair had a set of "take-home keys" since her employment began in February 2003.

73.     On October 17, 2007, Clair sent another memo addressing continuing harassment to Larry Flynn and Elona Cruz.

74.     On October 23, 2007, Clair sent yet another memo to Larry Flynn about the harassment and problems that needed to be addressed.

75.     During November of 2007, Warden Martin assigned Clair more training duties, causing her to have more contact with Mr. Seyler, including

reporting duties.  Clair reported the incident to Ms. Cruz, who agreed it was not Clair's place per policy.

76.   On November 30, 2007, Clair became aware that several RCC staff were trapping and shooting cats on the RCC premises.

77.   On that same date, Warden Martin also made an inappropriate sexual joke to Clair when she asked what was meant by the label Sex Offender, 3rd Degree.

78.   On December 14, 2007, Clair was walking toward the Admin Building, where Warden Martin and Mr. Russell Cain were standing outside talking. Warden Martin exclaimed "WHAT!?!" throwing his shoulders back.  The day before, Ms. Seyler made a gesture of shooting with a gun toward Clair as she walked by.  These type of actions were typical of what Clair experienced on a regular basis, in addition to being the target of multiple allegations of wrongdoing. The workplace felt very hostile to Clair at that point.

79.   On January 15, 2008, Clair called the Roswell Animal Control to ask questions about laws regarding shooting cats.  She spoke with the female director, who pressed her for the location.  Clair was reluctant to disclose the exact location, but told her that it was in the county, about 20 miles from town and that it was on State property.

80.   Within a hour or so of the phone call referenced in the preceding paragraph,  Warden Martin accused Clair of filing a complaint with Animal Control.   He told her that she reported her name and her location to

Animal Control.  She told him she did call, but only to ask questions and did not report her name or precise location.

81.  The next day, a catalogue of products for cats was found in Clair's work mailbox.  The catalogue had a mailing label indicating it had been sent to Officers Sandy and Marceene Glanton.  Mr. Glanton was one of the staff who had been shooting cats.   Clair showed Warden Martin the catalogue and told him the games must stop.

82.  On January 17, 2008 , Clair sent a memo to Mr. Flynn regarding the inhumane use of cats for target shooting.  On that same day, Clair received an advisement that she had been placed under investigation.

83.  Around that same date, Clair was advised that an African American and Muslim employee of RCC, Lt. Kiethan Valentine, whom she had supported in his complaints of discrimination, had been placed under advisement of investigation for wrongdoing.  Like Clair, after complaining of discrimination, Valentine found himself the target of wrongdoing.

84.  Similarly, a former RCC female employee found herself the target of an investigation after she reported to Warden Martin that Deputy Warden Hendrix had sexually harassed her.

85.  The administration at RCC, including the individual defendants, had a pattern and practice of responding to allegations of discrimination, harassment and/or retaliation by trumping up charges of wrongdoing and turning the investigation against the complainants.

86.     Following her multiple complaints, Ms. Clair faced constant opposition by
        the individual defendants, who were those in command at RCC.  She
        became the target of an unwarranted investigation and was threatened
        with adverse actions.  She continued to report policy breaches and
        wrongdoing, and as a result, the hostility increased.  Others in the
        workplace turned a blind eye or went along with the improper behavior
        while she opposed and reported it.  As a result, she was the victim of a
        series of retaliatory, intimidating and threatening acts that created a work
        environment so hostile that it became intolerable.

87.     At that point, Clair was upset and wanted to quit.  Clair felt the situation
        was hopeless.  She could not tolerate the continued harassment and the
        lack of effective response to her complaints.  She submitted her
        resignation.

88.     Clair gave her notice of resignation in January 2008.  Clair spoke with Ms.
        Cruz about the matter, who told Clair she was sorry that nothing had been
        done.   Clair asked Cruz if she had heard anything about the investigation
        of her complaints made in the preceding summer and thereafter.  Cruz
        told her the investigation was still pending.

89.     Clair's last day of work was February 16, 2008.

## Count I: Retaliation
## Brought Pursuant to Title VII
## Against Corrections Department

90.     Plaintiff Clair incorporates the allegations contained in the preceding
        paragraphs as though fully set out herein.

91.    Clair engaged in acts of opposition and participation, including but not
       limited to resisting unwelcome sexual comments and other verbal conduct
       of a sexual nature, and reporting same to the Warden and to the Assistant
       Warden, as well a submitting a formal grievance, which acts of opposition
       and participation are statutorily protected by Title VII.

92.    In addition to her own complaints of discrimination, harassment and
       retaliation, Clair supported Lt. Valentine in his discrimination complaint.

93.    Managerial employees of the Corrections Department, with knowledge
       and in response to Clair's participation and opposition described above,
       subjected Clair to adverse employment action, including but not limited to
       setting Clair up for investigations without sufficient cause, and ultimately,
       created and condoned a continuing retaliatory and hostile work
       environment that Clair could not tolerate.

94.    The retaliatory grievances and complaints that were submitted against
       Clair after she had reported the sexual harassment, retaliation and other
       acts of wrongdoing, and the impending investigation, had the potential
       effect of subjecting her to a demotion, a reassignment or other disciplinary
       action.

95.    The Corrections Department's actions and inactions created and
       exacerbated a hostile work environment.

96.    Clair faced working conditions so difficult and intolerant that she resigned.
       These conditions were such that a reasonable person in Clair's position

would have no choice but to cease working for the Corrections Department, as she did.

97.    As a direct and proximate result of the actions of the Corrections Department's employees and agents, Clair has suffered harm for which she is entitled to compensatory and punitive damages.

98.    The Corrections Department's employees and agents, including those named herein, acted in a willful, malicious, intentional and unlawful manner, and in reckless disregard of Clair's rights, and Clair demands and is entitled to exemplary or punitive damages in an amount which bears a reasonable relationship to her actual damages.

### Count II: Civil Rights Violation
### Brought Pursuant to 42 U.S.C § 1983
### Against Individual Defendants

99.    Plaintiff Clair incorporates the allegations contained in the preceding paragraphs as though fully set out herein.

100.   This Count is based on a violation of Clair's equal protection rights.

101.   The individual defendants violated Clair's equal protection rights by their actions alleged above which were unwelcome and constituted sexual harassment and retaliation. These acts were done with intent to harass based on Clair's gender and with intent to retaliate for her opposition to such acts.  Further, the acts of sexual harassment and retaliation were sufficiently severe and pervasive to alter the conditions of Clair's employment and to create a hostile and offensive work environment.

102.    As a direct and proximate result of the individual defendants' conduct,

Clair has sustained emotional distress, anxiety and humiliation, as well as

economic losses, for which she is entitled to compensatory damages.

103.    The individual defendants acted in a willful, wanton, malicious, intentional

and unlawful manner, and in reckless disregard of Clair's safety and

rights, and Clair demands and is entitled to exemplary or punitive

damages against the individual defendants in an amount which bears a

reasonable relationship to her actual damages.

### Prayer for Relief

**WHEREFORE**,  Plaintiff Angelle Clair respectfully prays for the following relief:

A.    Jury trial on all issues so triable;

B.    Compensatory damages against the Defendants jointly and severally in

appropriate amounts (as yet undetermined);

C.    Punitive damages against the individual defendants severally, in

appropriate amounts (as yet undetermined);

D.    Reasonable attorney's fees and costs;

E.    Pre- and post-judgment interest as applicable; and

F.    Such other and further relief as the Court deems proper.

Respectfully submitted,

**ALMANZAR & YOUNGERS, P.A.**

 */s/ electronically filed 4/14/10*
JOLEEN K. YOUNGERS
P.O. Box 7256
Las Cruces, NM 88006
575/541-8000
jyoungers@zianet.com